The STATE of Utah, Plaintiff and Respondent,

v.

Johnnie Patrick KNIGHT, Defendant and Appellant.

No. 20670.

Supreme Court of Utah.

March 19, 1987.

Jo Carol Nesset-Sale, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Sandra L. Sjogren, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

ZIMMERMAN, Justice:

Defendant Johnnie Patrick Knight appeals from a jury conviction on a charge of aggravated robbery. Knight contends that during discovery, the prosecution assumed the obligation to provide defense counsel with certain requested information, including the correct addresses and telephone numbers of two potential witnesses and statements taken from those witnesses by an investigator. Knight complains that the prosecutor did not fulfill this obligation and that as a result, Knight's ability to defend was impaired because the two witnesses appeared at trial and gave unanticipated testimony. Knight further argues that the prejudice to his defense was not mitigated as it should have been because the trial court denied his motions for a continuance or a mistrial. We agree and reverse the conviction.

On February 2, 1984, the One Hour Martinizing Cleaners located at 1689 South West Temple Street in Salt Lake City was robbed of approximately $85.50. Two masked men carrying weapons entered the establishment through the employees' entrance, forced the manager to lie on the floor, and compelled an employee to open the cash register. After removing the money from the till, the men took the manager's checkbook and wallet, cut the telephone cord, and fled.

The manager and the employee were not able to describe the robbers' facial characteristics because the faces were almost entirely covered. However, the employee was able to describe to investigators a man who had entered the establishment shortly before the robbery. The man stayed for only a moment and glanced around the

store while he asked for directions. Through a police photo lineup, the employee identified this man as Jeff Richens.

Immediately after the robbery, a motorist saw the robbers running out of the One Hour Martinizing Cleaners. The motorist followed in his car as the men ran down the middle of West Temple Street and then down an alley to a getaway car with a waiting driver. The motorist copied the license number of the car and noticed that the driver had long hair. The license number was turned over to police investigators who quickly located the car, which was parked on a roadside in West Valley City. The car was registered to Kim Richens, Jeff Richens' wife.

With Kim Richens' permission, investigators searched the car and found several items linking the car to the robbery. In the trunk of the car, they also found a wallet belonging to Johnnie Knight, along with some clothing, tools, and animal traps. When police investigators questioned Knight, he explained that he left his wallet in the trunk after a trapping excursion with Jeff Richens. Knight also stated that at the time of the robbery, he was with Georgia Moore, drinking coffee in her kitchen. Upon questioning, Georgia Moore corroborated Knight's story, and the wallet was returned to its owner.

Jeff Richens also was interviewed. Richens admitted involvement in the robbery and agreed to testify for the State. He pleaded guilty to a reduced charge of attempted robbery. Richens' story was that Johnnie Knight and Joseph Ridlon were the two masked robbers who carried weapons and that he was the driver of the car.

Knight and Ridlon were charged with aggravated robbery. At trial, they were co-defendants represented by separate counsel. Pursuant to Rule 16(a)(5) of the Utah Rules of Criminal Procedure, U.C.A., 1953, § 77–35–16(a)(5) (1982 ed.), counsel for Knight filed a written motion requesting that the trial court order the prosecution to disclose certain specified items and information, including the addresses and telephone numbers of the State's potential witnesses and any statements taken from them. A hearing on the motion was scheduled, but prior to the date of that hearing, the prosecutor agreed to comply voluntarily with the discovery request. The trial court cancelled the hearing and did not issue a discovery order.

In preparing to respond to the discovery request, the prosecutor assumed that all information pertaining to the case was located in his files. As a result, he did not check the files of other members of the prosecution team, and when providing the defense with the requested material, he did not indicate that he had not checked others' files.

The prosecutor's response listed Georgia Moore and her estranged husband, Walter Moore, among the witnesses the State intended to call. The prosecutor did not disclose that any statements had been taken from the Moores. He did list addresses and telephone numbers for the Moores, but they were not current. A few days before trial, defense counsel asked the prosecutor whether he had discovered the Moores' current addresses and telephone numbers. The prosecutor truthfully responded that his subpoenas had been returned unserved and that he had been unable to locate the Moores. However, within a day or two the prosecutor managed to contact the Moores (one of whom was living out of the state) and arranged for them to attend trial and testify. As a result of this contact, the prosecutor obtained correct addresses and telephone numbers for the Moores. These were not given to defense counsel prior to trial.

On the first day of the two-day trial, defense counsel learned that an investigator for the State, Sergeant Adamson, had taken statements from both of the Moores months before trial and that the statements had lain in Adamson's files ever since. That evening, defense counsel obtained copies of the statements. Their substance was as follows:

(i) According to the statement given to Adamson by Georgia Moore, Knight had asked her to be his alibi for a robbery he was accused of but did not commit, and she had agreed. However, at the time of

the interview with Adamson, Georgia Moore said that she was tired of lying and that Knight was not in her kitchen at the time of the robbery.

(ii) According to Walter Moore's statement to Adamson, Knight telephoned him shortly after the time of the robbery and asked him to pick up Knight and a friend because they were having car trouble. Walter Moore picked up Knight and Richens and the three then drove past Richens' car (the getaway car), which was parked on a roadside in West Valley City.

At the opening of trial on the second day, defense counsel made appropriate objections to the Moores' testifying, moved for mistrial, requested a continuance, and attempted to withdraw as counsel. The trial court denied all motions. Both Georgia and Walter Moore were allowed to testify, and defense counsel was not given any additional time to meet the unanticipated testimony. Knight was convicted of aggravated robbery, while co-defendant Ridlon was acquitted.

This appeal presents two questions: first, whether the State's failure to disclose the Moores' statements, addresses, and telephone numbers was error; second, if error was committed, whether defendant suffered prejudice sufficient to warrant reversal.

The starting place for analyzing the propriety of the prosecutor's conduct is defendant's motion to discover. That motion sought, *inter alia,* the following:

A. A list of all the witnesses that the State intends to call for trial in the above-entitled matter, their addresses and telephone numbers;

B. Any recordings, reports, transcripts, or reports about statements in possession of any member, or group involved in the prosecution or the investigation of the above-entitled case taken from the witnesses listed in point [A] above.

The prosecutor's obligation to comply with this request for discovery must be evaluated under Rule 16 of the Utah Rules of Criminal Procedure, which states in pertinent part:

(a) Except as otherwise provided, the prosecutor shall disclose to the defense *upon request* the following material or information of which he has knowledge:

(1) Relevant written or recorded statements of the defendant or co-defendants;

(2) The criminal record of the defendant;

(3) Physical evidence seized from the defendant or co-defendant;

(4) Evidence known to the prosecutor that tends to negate the guilt of the accused, mitigate the guilt of the defendant, or mitigate the degree of the offense for reduced punishment; and

(5) *Any other item of evidence which the court determines on good cause shown should be made available to the defendant in order for the defendant to adequately prepare his defense.*

U.C.A., 1953, § 77–35–16 (1982 ed.) (emphasis added).

Where, as here, the requested material is not covered by the detailed descriptions in subsections (a)(1) through (a)(4), which mandate disclosure upon request, subsection (a)(5), the catch-all provision, applies. It requires disclosure of the material sought only to the extent ordered by the trial court.[1] However, when the prosecution chooses to respond voluntarily to a request under subsection (a)(5) without requiring the defense to obtain a court order, considerations of fairness require that the prosecution respond to the request in a manner that will not be misleading. Therefore, we articulate two requirements that the prosecution must meet when it responds voluntarily to a request for discovery. First, the prosecution either must produce all of the material requested or must identify explicitly those portions of the request with respect to which no re-

---

**1.** Failure to properly request a court order under section 77–35–16(a)(5) may be fatal to a claim based on the nondisclosure of evidence. *See State v. Booker,* 709 P.2d 342, 346 (Utah 1985); *cf. State v. Workman,* 635 P.2d 49, 53 (Utah 1981) (failure to exercise reasonable diligence in conducting discovery tends to negate a claim that nondisclosure was erroneous).

sponsive material will be provided. Second, when the prosecution agrees to produce any of the material requested, it must continue to disclose such material on an ongoing basis to the defense. Therefore, if the prosecution agrees to produce certain specified material and it later comes into possession of additional material that falls within that same specification, it has to produce the later-acquired material.[2]

Some discussion of the rationale behind these two requirements is warranted. With respect to the first—that the government produce everything requested or identify the material not being provided—the observations of the United States Supreme Court in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), are instructive, although they dealt with neither the type of evidence involved in this case nor Utah's discovery statute.

> The Government notes that an incomplete response to a specific request not only deprives the defense of certain evidence, but has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.
>
> We agree that the prosecutor's failure to respond fully to a ... request may impair the adversary process in this manner.

*Id.* at 682, 105 S.Ct. at 3384 (citation omitted).

For the misleading-the-defense rationale to apply, the discovery request must be sufficiently specific to permit the prosecution to understand what is sought and to justify the parallel assumption on the part of the defense that material not produced does not exist. *Id.* at 682–83, 105 S.Ct. at

3384–85; *see, e.g., State v. Fierst,* 692 P.2d 751, 752 (Utah 1984); *cf. State v. Booker,* 709 P.2d 342, 346 (Utah 1985). The request in the present case specifically and unmistakably sought disclosure of subsection (a)(5) material consisting of the names and addresses of witnesses and their statements. The prosecution clearly understood what was requested and agreed to provide all that it had.

The second requirement—that there be a continuing obligation to disclose material falling within the scope of the agreement to produce—is not a novel requirement, but is a specific application of a burden we imposed on the government in *State v. Carter,* 707 P.2d 656 (Utah 1985). There, we observed that a prosecutor has a continuing obligation to reveal newly discovered evidence that fits within the scope of prior disclosures. This obligation was imposed to make criminal discovery a fair process. In *Carter,* we stated:

> To meet basic standards of fairness and to insure that a trial is a real quest for truth and not simply a contest between the parties to win, a defendant's request for information which has been voluntarily complied with, or a court order of discovery must be deemed to be a continuing request. And even though there is no court-ordered disclosure, a prosecutor's failure to disclose newly discovered inculpatory information which falls with[in] the ambit of § 77–35–16(a), after the prosecution has made a voluntary disclosure of evidence might so mislead defendant as to cause prejudicial error.

*Id.* at 662.[3]

In the present case, the prosecutor's conduct plainly did not satisfy either of the two requirements set forth above. First, he did not notify defense counsel of

---

**2.** Absent such a requirement, defense counsel would have to submit frequent requests to the prosecution to be sure that all pertinent material had been produced. No practical purpose would be served by imposing such a burdensome requirement on the defense. Moreover, great potential for game-playing between the prosecution and the defense is inherent in a discovery system that lacks a continuing obligation to disclose.

**3.** The requirements imposed in *Carter* and the present case not only ensure that a trial is a real quest for truth, but also should increase confidence in informal discovery procedures by making the obligations of the parties more certain and thereby should reduce the need for court-ordered discovery in an already-burdened criminal justice system.

the limited nature of his response to the request for production. The defense requested "statements in possession of any member, or group involved in the prosecution or the investigation of the above-entitled case." The prosecutor agreed to provide the materials sought, but he furnished only the information found in his own files. He did not determine whether others "involved in the prosecution or the investigation" of the case had additional materials responsive to the request. Given the explicit language of the request, there is no question that the prosecutor's unconditional agreement to produce obliged him to search beyond his own file cabinet.[4] He did not do so, and he did not inform defense counsel of that fact.[5]

The second requirement also was violated because the prosecutor did not provide defense counsel with after-acquired information responsive to the request, specifically, the current addresses and telephone numbers of the Moores.

Having determined that the prosecutor violated his discovery duties, the next question is whether the trial court erred in refusing to grant any of the relief sought by defense counsel after the violation was brought to its attention. Rule 16(g) provides:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

U.C.A., 1953, § 77–35–16(g) (1982 ed.). Under this rule, the trial court has ample power to obviate any prejudice resulting from a breach of the criminal discovery rules. If it does so, the defendant obviously cannot complain of the prosecutor's conduct, since the defendant's substantial rights will not have been affected. *See* Utah R.Crim.P. 30 (codified in U.C.A., 1953, § 77–35–30(a) (1982 ed.)).

On the other hand, if the trial judge denies the relief requested under Rule 16(g), that denial may constitute an abuse of discretion warranting a reversal. An abuse of discretion occurs when, taking into account any remedial measures ordered by the trial court, the prejudice to the defendant still satisfies the standard for reversible error set forth in Rule 30, and the remedial measures requested but refused would have obviated this prejudice.

4. The facts of this case illustrate the value of written requests for production and of carefully drawn responses. Had the prosecutor drafted a response to exclude information in other files, the defense could not have been misled by his nonproduction of the Moores' statements. On the other hand, had defense counsel been informed that the prosecution would not voluntarily produce requested material, she could have taken steps to seek an order compelling production.

5. Before the trial court, the prosecutor argued that he had acted in good faith with regard to the Moores' statements. He explained that he had assumed responsibility for the case after the previous prosecutor was transferred and that during discovery he had acted under the assumption that all information pertaining to the case was in the files that were given to him. Before this Court, the State does not explicitly assert that the prosecutor's good faith is a defense to the claim of error.

The prosecutor's good faith should not have had any impact on the trial court's determination of whether the prosecutor had violated his discovery duties. In *State v. Shabata,* 678 P.2d 785 (Utah 1984), this Court stated:

> At the outset, we stress that we are concerned with more than the prosecutor's state of knowledge.... Information known to police officers working on the case is charged to the prosecution since the officers are part of the prosecution team. Neither the prosecutor nor officers working on a case may withhold exculpatory evidence or evidence valuable to a defendant.
>
> ... [T]he good or bad faith of the prosecutor is irrelevant.

*Id.* at 788 (citations omitted). While constitutional principles imposed the duty to disclose exculpatory evidence in *Shabata,* whereas the duty to disclose inculpatory evidence in the instant case was assumed voluntarily, the principle stated in *Shabata* is applicable here: information known to any part of the prosecution team is charged to the prosecutor, and the prosecutor's good faith ignorance does not excuse nondisclosure. If any weight were given to good faith ignorance, it would only encourage after-the-fact justifications for nondisclosure.

In the present case, the trial court denied all requested relief, including defendant's motions for a continuance and for a mistrial, either of which would have mitigated the prejudice he suffered.[6] Whether the trial court abused its discretion in denying those motions therefore depends entirely upon a determination of whether the prosecutor's failure to produce the requested information resulted in prejudice sufficient to warrant reversal under Rule 30.

Rule 30 states: "Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." U.C.A., 1953, § 77-35-30 (1982 ed.). The meaning of this standard is not entirely clear from our cases. We have ruled in several cases that the Rule 30 phrase "affect the substantial rights of a party" means that an error warrants reversal "only if a review of the record persuades the court that without the error there was *'a reasonable likelihood of a more favorable result* for the defendant.'" *State v. Fontana,* 680 P.2d 1042, 1048 (Utah 1984) (quoting *State v. Hutchison,* 655 P.2d 635, 637 (Utah 1982) (emphasis added)); *see also State v. Velarde,* 734 P.2d 440 (1986).[7] And we have applied this rule in cases involving nondisclosures by the prosecution. *See State v. Schreuder,* 712 P.2d 264, 275-76 (Utah 1985) (defendant failed to show a "reasonable probability" that the undisclosed evidence would have affected the outcome of trial). In other cases involving nondisclosure, our statements of the standard have been less precise. *State v. Carter,* 707 P.2d 656, 662 (Utah 1985) (failure to disclose evidence did not so mislead defendant as to cause prejudicial error); *State v. Workman,* 635 P.2d 49, 53 (Utah 1981) (surprise testimony was without prejudicial effect). We think that the "reasonable likelihood" standard set forth in *Fontana, Hutchison, Velarde,* and *Schreuder* best explains Rule 30's test for reversible error. In light of our inconsistent expressions of this standard in the past, we will take this opportunity to flesh out the meaning of the phrase "reasonable likelihood of a more favorable result."

If we assume a spectrum of probabilities with zero percent at one end representing no likelihood of a different result and one hundred percent at the other end representing absolute certainty of a different result, we can array verbalizations of probabilities across that spectrum. A "mere possibility" is at the low end of the spectrum, "near certainty" is at the high end, and "more probable than not" is a likelihood greater than fifty percent. Of course, we cannot

---

**6.** The fact that a motion for relief under Rule 16(g) was made is significant under our decisions in *State v. Workman,* 635 P.2d 49, 53 (Utah 1981) (defendant's failure to seek a continuance tends to negate claimed element of surprise), and *State v. Schreuder,* 712 P.2d 264, 275-76 (Utah 1985) (defendant's claim of prejudice was precluded in part because he did not give the trial court an opportunity to avoid or to mitigate the prejudice resulting from the nondisclosure).

**7.** We are dealing here with the outcome of trial, not the outcome of plea bargaining. A separate point defendant raises on appeal is that he was denied effective assistance of counsel during plea bargaining. He reasons that counsel could not advise him effectively as to the wisdom of accepting or rejecting plea bargain offers without the information that was withheld by the prosecution.

We have previously rejected claims alleging ineffective assistance of counsel when a defendant has rejected a plea bargain and has retained his or her right to a fair trial. For example, in *State v. Geary,* 707 P.2d 645, 646 (Utah 1985), we stated: "[Defendant] loses sight of the fact that our state and federal constitutions guarantee fair trials, not plea bargains."

At most, the cases cited by defendant lend indirect support to the proposition that the State cannot enforce a defendant's guilty plea and consequent waiver of his right to a fair trial if he has been denied effective assistance of counsel in deciding whether to waive his rights. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (individual accused of crime may voluntarily, knowingly, and understandingly consent to imposition of a prison sentence even if he or she is unwilling to admit participation in the acts constituting the crime); *Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 667, 54 L.Ed.2d 604 (1978) (defendants advised by competent counsel are presumptively capable of intelligent choice in pleading guilty); *see also State v. Kay,* 717 P.2d 1294, 1299 (Utah 1986) (defendant must act freely, voluntarily, and with full knowledge when he or she *pleads guilty* and thereby waives important constitutional rights). In this case, defendant did not waive his right to a fair trial by pleading guilty as did the defendants in *Alford, Bordenkircher,* and *Kay.*

assign a definite spot on the spectrum to the term "reasonable likelihood," but we can give some guidance to the lower courts and counsel as to where a "reasonable likelihood" should fall.

In defining a similarly worded standard, the United States Supreme Court has stated: "A reasonable probability is a probability sufficient to undermine confidence in the outcome." [8] *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); *see also United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (*Strickland* articulation of the reasonable probability standard applied in a case involving nondisclosure of impeachment evidence). Although the United States Supreme Court's interpretation of "reasonable probability" is not binding on this Court when construing state criminal rules, we are persuaded that defining the substantively identical term "reasonable likelihood" by reference to a reviewing court's confidence in the outcome of trial makes good sense in determining whether reversible error has occurred. Rules that govern criminal proceedings are meant to ensure that a trial is a search for truth and that the verdict merits confidence. It is entirely consistent with this aim to require that when error has eroded a reviewing court's confidence in the outcome of a particular trial, we should start over and conduct a new trial.

The erosion-of-confidence criterion gives substance to the more theoretical "reasonable likelihood" standard. It thus assists us in determining where on the spectrum of outcome probabilities discussed earlier "reasonable likelihood" might appear. For an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict. This is certainly above the "mere possibility" point on the spectrum. If it is "more probable than not" that the outcome of trial would have been different, then a court cannot possibly place confidence in the verdict. Furthermore, thoughtful reflection suggests that confidence in the outcome may be undermined at some point substantially short of the "more probable than not" portion of the spectrum. It may not be possible to define "reasonable likelihood" much more explicitly than this, but the foregoing should be of some assistance in deciding whether an error requires reversal.

Applying Rule 30 to the prosecutor's violations of his discovery duties, we must determine whether there is a reasonable likelihood that the outcome of Knight's trial would have been more favorable to him had the prosecution revealed the requested material. This determination normally is based upon a review of the record. *State v. Fontana,* 680 P.2d 1042, 1048 (Utah 1984). If taken literally, this review procedure would require us to determine from the record what evidence would have been before the jury absent the error. However, when, as here, the error consists of the prosecution's failure to provide a defendant with inculpatory evidence, the record does not provide much assistance in discovering the nature or magnitude of the resulting prejudice to the defense. The record cannot reveal how knowledge of this evidence would have affected the actions of defense counsel, either in preparing for trial or in presenting the case to the jury. To a large extent, this leaves the reviewing court to speculate whether, absent the error, there is a reasonable likelihood that the defense would have adduced other evidence which, when considered in light of the evidence actually presented, would have pro-

---

8. Language in *State v. Lairby,* 699 P.2d 1187, 1205 (Utah 1984), indicates that the "reasonable probability" standard is somewhat lower than the "reasonable likelihood" standard; on reflection, this statement appears wrong. The words "likelihood" and "probability," as used in these error-measuring standards, are synonymous, and the two standards have been used interchangeably by this Court. *See State v. Pierre,* 572 P.2d 1338, 1352 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978) ("error must be such that there exists a *reasonable probability or likelihood* that there would have been a result more favorable to the defendant in absence of the error" (emphasis added)). *Compare State v. Fontana,* 680 P.2d 1042, 1048 (Utah 1984) ("reasonable likelihood" standard), *with State v. Schreuder,* 712 P.2d 264, 275–76 (Utah 1985) ("reasonable probability" standard).

duced a reasonable doubt as to the defendant's guilt.

■ Because of the difficulties posed by the record's silence in cases involving a wrongful failure to disclose inculpatory evidence, it seems appropriate in such instances to place the burden on the State to persuade a court that the error did not unfairly prejudice the defense. Therefore, when the defendant can make a credible argument that the prosecutor's errors have impaired the defense, it is up to the State to persuade the court that there is no reasonable likelihood that absent the error, the outcome of trial would have been more favorable for the defendant.

In the present case, the defense makes several arguments in support of its claim that the defense was impaired. First, because of the prosecutor's representations before trial that he was unable to locate the Moores and his failure to disclose the Moores' correct addresses and telephone numbers when he obtained them, the defense had no opportunity to contact the Moores and had no reason to expect that they would be present to testify. As far as the defense knew, Richens was the main witness against Knight and the focus of the trial would be on Richens' credibility. Defendant claims that this erroneous focus profoundly influenced defense counsel's pretrial strategy and trial preparation.

Second, even if the defense should have expected the Moores to testify because they were listed as possible witnesses, the prosecutor's failure to respond fully to the discovery request left the defense unaware of the existence and content of the statements that the prosecution had taken from the Moores. This, defendant contends, impaired his counsel's ability to prepare to meet the Moores' testimony.

We cannot determine with any certainty from the record whether, absent the prosecutor's nondisclosures, the defense would have been better prepared to meet the Moores' testimony. However, the contention that the defense was caught off-guard and was denied sufficient time to explore ways of meeting the Moores' testimony rings true, and we certainly cannot say

that advance notice would not have led to the introduction of other evidence that would have undermined their statements. Moreover, as we discuss below, the Moores' testimony was apparently pivotal to the jury's conviction of Knight and acquittal of Ridlon. Given the centrality of this testimony, the possible denial of adequate opportunity to meet it assumes heightened importance when evaluating whether the defense might have been impaired.

■ Having thus weighed these arguments, we conclude that defendant has presented a credible argument that his defense was impaired. Therefore, the State must bear the burden of persuading us that the error was not prejudicial. It can meet this burden by showing that despite the errors, the outcome of trial merits confidence and there is no reasonable likelihood of a more favorable result for defendant. In *State v. Carter*, 707 P.2d 656 (Utah 1985), for example, the prosecutor failed to disclose that the victim had seen the defendant near the scene of the burglary. Although the nondisclosure was error, the State convinced this Court that the nondisclosure did not significantly mislead the defendant during trial preparation. *Id.* at 662. This Court also was convinced that the undisclosed evidence was not crucial to the prosecution's case because other substantial evidence tied the defendant to the burglary. *Id.*

In the present case, the State attempts to show that the errors were not prejudicial. Here, in contrast to *Carter*, we find the State's arguments unpersuasive. The State's first argument is based on the following facts: Sometime after Georgia Moore talked to investigators and corroborated Knight's alibi story, the Knights and the Moores had a falling out. The two families came into conflict while living together in a one-family house. The Moores moved out, and when they came to pick up their belongings, certain items—guns, a microwave, welding equipment, and tools—were missing. The Moores accused defendant Johnnie Knight of stealing these things. The conflict escalated, and Georgia Moore wrote a letter to Knight in which

she stated: "You not only steal from friends, you continue to screw them time after time. John, Kenny's back at the point.[9] You'll be seeing him *soon.* Say hi for me." Following this conflict, Georgia Moore was listed as one of the State's witnesses. .

Based on these facts, the State argues that the defense could not have been genuinely surprised that Georgia Moore no longer intended to corroborate Knight's alibi story. The State's argument can be restated in this way: Defense counsel had ample opportunity to consult with Knight concerning the fact that he had asked Georgia Moore to provide him with an alibi and to lie to investigators, and defense counsel could not have expected Georgia Moore to continue to lie for Knight after the dispute, especially when she was listed as a witness for the State.

We find this argument unpersuasive because it presumes that Georgia Moore's testimony at trial was true. If Georgia Moore concocted the events described in her testimony to hurt Knight, then—absent disclosure of her statement—the defense had no way of knowing what she would say and could not prepare to meet it. In addition, the defense may have supposed that the State was listing Georgia Moore as a possible credibility or character witness (in case Knight took the stand) and that she would testify as to the events surrounding the dispute between the families.

■ The State's second argument is that Knight was not prejudiced because defense counsel was prepared to meet the testimony of the Moores. For this proposition, the State relies upon the fact that defense counsel did cross-examine the Moores vigorously and attempted to show that they had a motive to lie because of the earlier disagreement between the Moores and Knight. The fact that defense counsel conducted vigorous cross-examination is not proof that she was fully prepared to meet the Moores' testimony. We do not know what additional impeachment evidence might have been submitted to the jury if

the defense had seen the Moores' statements before trial and had prepared to discredit the specific allegations in the statements. We cannot presume that the events at trial would have been unaffected.

For example, if evidence had been obtained demonstrating that Walter Moore was out of town on the day of the robbery, this evidence would have entirely discredited his testimony. But if defendant had no pretrial indication as to the nature of Walter Moore's testimony, then there was no reason for defendant to attempt to locate such evidence. Since defense counsel only had one evening and a lunch break to prepare to meet the Moores' testimony, we are not persuaded that the defense was as effective as it would have been if defense counsel had been granted a continuance to meet the undisclosed evidence.

The State's third argument is based on *State v. Carter,* 707 P.2d 656 (Utah 1985). The State contends that even if the Moores' testimony was a surprise, defendant was not significantly prejudiced by it because other substantial testimony tied defendant to the robbery. Specifically, the State relies on the facts that an accomplice's testimony implicated Knight and that Knight's billfold was found in the trunk of the car. We disagree.

The Moores' testimony was crucial to the prosecution's case. Richens testified that he, Ridlon, and Knight committed the robbery, thereby equally implicating the two co-defendants in the crime. Evidently, Richens' testimony alone was insufficient to convince the jury of the co-defendants' guilt, because Ridlon was acquitted. The State introduced additional evidence against Knight, and Knight was convicted.

The first piece of additional evidence against Knight was the fact that his wallet was found in the trunk of the getaway car, along with some tools, clothing, and animal traps. It is unlikely that Knight would have been convicted if the wallet had been the only evidence against him other than Richens' testimony. Richens testified that

---

**9.** The term "the point" is short for "the point of the mountain," a term which is used to refer to

a gap in the Traverse Mountains near which the Utah State Prison is located.

before the date of the robbery, he and Knight had gone trapping together on several occasions and left their wallets in the car while trapping.

The other additional evidence against Knight was the testimony of the Moores. If the jury believed Georgia Moore's testimony, then Knight, by setting up an alibi, was trying to hide the truth about his actions during the time of the robbery. If Walter Moore's testimony was believed by the jury, then Knight was with Richens and the getaway car shortly after the time of the robbery. This testimony corroborated Richens' testimony and tied Knight to the crime.

In addition, the Moores' testimony brought another force into play against Knight. As a result of the Moores' testimony at trial, counsel for his co-defendant, Ridlon, decided to change his theory of the case. Halfway through the trial, Ridlon's counsel informed Knight's counsel that in his closing argument he would attempt to persuade the jury that Richens and Knight robbed the cleaners and that a woman was driving the car, a woman whom Richens was trying to protect by implicating Ridlon.[10] During closing argument, Ridlon's counsel argued this theory to the jury and, in doing so, emphasized the evidence other than Richens' testimony tying Knight to the crime, particularly the Moores' testimony.

 It is apparent that the Moores' testimony was pivotal in Knight's conviction. The State cannot argue that the Moores were unimportant witnesses or that their testimony was not crucial to the prosecution's case against Knight. Given co-defendant Ridlon's acquittal, there is a high likelihood that Knight would not have been convicted in the absence of the Moores' testimony.

Because the State has failed to persuade us that the defense was not prejudiced by its nondisclosure of the inculpatory evidence, we conclude that absent the prosecutor's errors, there is a reasonable likelihood of a more favorable result for defendant. Therefore, the trial court abused its discretion in denying defendant's motion for a continuance or mistrial.[11] The conviction is reversed.

HALL, C.J., STEWART, A.C.J., and HOWE and DURHAM, JJ., concur.

---

**10.** The prejudice to defendant's pretrial strategy has already been mentioned. Knight's counsel argues that if the statements had been disclosed when requested, she would not have been surprised by co-defendant's changed strategy and would have moved for a severance five days in advance of trial, as required by Rule 9(d) of the Utah Rules of Criminal Procedure, U.C.A., 1953, § 77–35–9(d) (1982 ed.). It does appear that the prejudice to Knight resulting from co-defendant's argument that Knight was a guilty party could have been avoided by separate trials. However, we need not reach the issue of whether it would have been error for the trial court to deny a motion for severance. The issue will not be raised on remand because co-defendant Ridlon was acquitted.

**11.** The remaining issues raised by defendant are of no merit.