**2019 UT App 65**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ADAM ZAKARIA A. AHMED,
Appellant.

Opinion
No. 20170539-CA
Filed April 25, 2019

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 161907424

Diana Pierson, Andrea J. Garland, and Sarah J.
Carlquist Attorneys for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1　Appellant Adam Zakaria A. Ahmed challenges his conviction for possession of a controlled substance with intent to distribute, arguing, primarily, that the trial court erred in denying him access to the surveillance location from which law enforcement observed the conduct that culminated in his arrest. We reverse, provisionally, and remand for further proceedings.

## BACKGROUND[1]

### *The Arrest*

¶2     On a Spring day in 2016, a drug interdiction officer (the Officer) conducted surveillance from a ground-level room of an office building located, according to his testimony, approximately forty feet from where Ahmed was arrested near the homeless shelter in the crime-ridden Rio Grande neighborhood of Salt Lake City. According to the Officer, while standing on a desk and looking through the top of an 8-foot tall window, "part[ing] the blinds just enough" to make room for his binoculars, his attention was drawn to two men—later identified as Ahmed and his cohort, Troy Pace. The Officer observed "multiple different individuals" approach Ahmed and Pace and "hand[] them money" in "quick, hand-to-hand transactions and walk away." Based on the Officer's experience and training, he recognized this behavior as being consistent with drug dealing.

¶3     The Officer testified that he observed Ahmed and Pace for "about 30 minutes," during which time he saw the men distribute what was later determined to be spice[2] in "multiple

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

2. Spice is a synthetic cannabinoid made with "mind-altering chemicals that are either sprayed on dried, shredded plant material so they can be smoked or sold as liquids to be vaporized and inhaled in e-cigarettes and other devices." *Synthetic Cannabinoids (K2/Spice)*, National Institute on Drug Abuse, https://www.drugabuse.gov/publications/drugfacts /synthetic–cannabinoids–k2spice [https://perma.cc/ESC2–NMJ2].
(continued…)

different ways." They sold spice in "joints that were already rolled," or in "containers that had some loose spice or . . . spice joints in them." He also observed them "pour out loose spice" into purchasers' own rolling paper. The Officer also testified that throughout these exchanges, consistent with his past observations of drug deals, Pace "act[ed] primarily as a holder," tasked with keeping the "majority of the drugs and the money," while Ahmed "act[ed] as a dealer," "dealing out small amounts" of spice and being "resupplied by . . . Pace."

¶4    After approximately "10 to 15 separate individuals or groups" interacted with Ahmed and Pace in this manner, the Officer radioed "takedown officers" positioned "around the corner" and instructed them to detain an individual who he believed had just purchased spice from Ahmed. Upon searching this buyer, the officers found what they believed to be spice cigarettes, given their color and smell. Based on his observations and the discovery made during the search of the buyer, the Officer concluded there was probable cause to arrest Ahmed and Pace, and he radioed the takedown officers and instructed them to take the pair into custody.

¶5    The Officer described Ahmed to the takedown officers as a "black [male] with a tan coat" and Pace as the "taller" of the two and wearing a backpack. The Officer provided no additional

---

(…continued)

"These chemicals are called *cannabinoids* because they are similar to chemicals found in the marijuana plant. Because of this similarity, synthetic cannabinoids are sometimes misleadingly called 'synthetic marijuana' (or 'fake weed'), and they are often marketed as safe, legal alternatives to that drug. In fact, they are not safe and may affect the brain much more powerfully than marijuana; their actual effects can be unpredictable and, in some cases, more dangerous or even life-threatening." *Id*.

descriptive details about either Ahmed or Pace. The Officer testified that when the takedown team was approximately twenty feet away from Ahmed, he saw Ahmed drop his "very large, heavy, tan coat." A member of the takedown team also testified that he saw Ahmed remove the coat and place it on the ground as he approached. A search of the coat revealed containers and joints of what appeared—and what testing later confirmed—to be spice.

*Legal Proceedings*

¶6    The State charged Ahmed with possession of a controlled substance with intent to distribute, a third degree felony, in violation of Utah Code section 58-37-8(1)(a)(iii).[3] During the preliminary hearing, Ahmed asked the Officer about the Officer's exact surveillance location from which he observed the alleged spice-dealing. The State objected and the Officer declined to disclose the information, citing safety concerns. Ahmed argued that his due process rights entitled him to this information. The trial court sustained the State's objection "for purposes of the preliminary hearing," but it allowed inquiry into the distances involved and the Officer's ability to observe the alleged crime.

¶7    Prior to trial, Ahmed moved to access the Officer's exact surveillance location "for the purpose of collecting relevant and exculpatory evidence in the possession of law enforcement." The State urged the court to deny Ahmed's motion, drawing an analogy to the confidential informant evidentiary privilege because "other courts have compared the location of a surveillance tower area to the name of a [confidential informant]." The State also argued that the court should deny

---

3. Pace was also charged and eventually pled guilty to violating the same statute.

the motion due to "officer safety concern[s]" and concerns for the owner of the particular building, and because disclosure would result in law enforcement's loss of the site for future surveillance work.

¶8     The trial court denied Ahmed's motion to access the Officer's surveillance location based on a "balance of interest." It reasoned that "there is a substantial need for law enforcement to be able to conduct undercover operations to try and catch those distributing controlled substance[s] in the area." The court also found the State had an interest in keeping the location secret because "[t]here are only a few higher buildings" in the area and disclosure of the surveillance location would limit its use by law enforcement, thus increasing "the importance of not revealing those locations."[4] Ultimately, the court denied Ahmed's request because "the community has an interest in effective law enforcement" in the Rio Grande neighborhood, which outweighed Ahmed's interest "in disclosure and [the] opportunity to prepare." The court did, however, instruct the State "to work with the defense . . . to see if [they could] at least allow some kind of viewing of a similar angle and distance."

¶9     In making this ruling, the court rejected the State's assertion that an evidentiary privilege prohibited disclosure of the site. Instead, the court found that this was "a question of the credibility of the officer" and "the Defense's need to try and cross-examine" him.

¶10     Ahmed's theory at trial was that he was misidentified. His own testimony was supported by Pace, who testified that he was

---

4. Although the Officer testified to surveilling from a "ground level" room, it was nonetheless from a somewhat elevated position because the building's 8-foot tall windows permitted him to surveil while standing atop a desk.

carrying a "light tan" "camouflage" backpack that contained spice. Pace also testified that he had a "tan" jacket that he had taken off and that was "sitting next to" him on the street. Pace further stated he was about 5'8" or 5'9". Finally, he testified that Ahmed was not dealing spice with him and was simply "walking by" when the takedown officers arrested both of them. Ahmed testified that he was in the area where the arrest took place because he "was visiting a friend." He denied dealing with Pace and insisted he had no spice on him that day. He also testified that he was 6'3", making him the taller of the two by several inches.

¶11    At the close of the State's case-in-chief, Ahmed moved for a directed verdict. He argued the State presented insufficient evidence to support a conviction, specifically, that "[w]e don't know who [the Officer] saw. He said a black male in a tan coat. He failed to mention any braids. He failed to mention a hat. He failed to estimate height, weight, features, hairstyle, age, eye color, [or] hair color." Ahmed further argued that "[w]ith regard to [the substance found on the buyer], there is no reliable evidence" that what was distributed was the same substance found in the coat because the substance retrieved from the buyer was never tested. Finally, Ahmed argued that the evidence was speculative because there was no fingerprint, DNA, or video evidence tying him to the alleged distribution. The court denied the motion, and the jury convicted Ahmed.

¶12    Ahmed subsequently filed a motion to arrest judgment, seeking dismissal or retrial following his being given access to the surveillance location. He argued, quoting *Nielsen v. State*, 2016 UT 52, 391 P.3d 166, that a keener understanding of the location was "necessary to a fair determination of the issue of guilt or innocence." *Id.* ¶ 22 (quotation simplified). The court heard oral argument on the motion. Ahmed argued that being "able to test whether there are reflections, . . . distortions, . . . odd angles or shadows" or too much traffic "for [the Officer] to be

able to have reliably watched what he said he watched" was "exculpatory information" to which he was constitutionally entitled. Ahmed faulted the court for not requiring the location to be revealed, claiming the court erred in relying on a supposed "public interest privilege," and argued that such a privilege was not recognized in Utah. The State disagreed, claiming it could withhold the location. In so arguing, the State drew an analogy to the confidential informant privilege. The court denied Ahmed's motion but declined to embrace the analogy to the confidential informant privilege, as it did not "see it as the . . . same issue." The court found that it was "more accurately addressed in the context of . . . reasonable limits on cross-examination," which were appropriate in this case "because . . . the interests of the State in maintaining the confidentiality of the location" outweighed Ahmed's interest in accessing the surveillance location.

¶13 The court sentenced Ahmed to a prison term, but it suspended that sentence and placed Ahmed on probation. This appeal followed.

ISSUES AND STANDARDS OF REVIEW

¶14 Ahmed raises two issues on appeal. First, Ahmed argues that the trial court erred in denying him access to the surveillance location as a reasonable limit on cross-examination because the location "is not privileged under Utah law." "A court's decision regarding the existence of a privilege is a question of law for the court, and is reviewed for correctness." *State v. Blake*, 2002 UT 113, ¶ 6, 63 P.3d 56 (quotation simplified). "When reviewing a trial court's decision to limit cross-examination, we review the legal rule applied for correctness and the application of the rule to the facts of the case for an abuse of discretion." *State v. Marks*, 2011 UT App 262, ¶ 11, 262 P.3d 13 (quotation simplified).

¶15    Second, Ahmed contends that the trial court erred in denying his motion for a directed verdict "because there was insufficient evidence to sustain his conviction." "In assessing a claim of insufficiency of the evidence, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645 (quotation simplified). "And a jury's inference is reasonable unless it falls to a level of inconsistency or incredibility that no reasonable jury could accept." *State v. Ashcraft*, 2015 UT 5, ¶ 18, 349 P.3d 664 (quotation simplified).

ANALYSIS

I. Surveillance Location

¶16    This appeal presents us with the question of whether Ahmed's rights were violated by the withholding of the Officer's surveillance location. Ahmed argues that his Sixth Amendment right to "present a complete defense" was violated. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Ahmed implores us to apply the "higher standard of scrutiny" by requiring the State to prove "the error harmless beyond a reasonable doubt." *See State v. Crowley*, 2014 UT App 33, ¶ 17, 320 P.3d 677. However, as explained below, because the violation committed was of rule 16 of the Utah Rules of Criminal Procedure and is amenable to remedial action, we decline to reach Ahmed's claim that his constitutional right to present a complete defense was violated.

A

¶17    Rule 16(a)(4) of the Utah Rules of Criminal Procedure requires prosecutors to turn over evidence upon request from the defense "that tends to negate the guilt of the accused." However, a defendant does not prevail on appeal simply by showing that the State failed to turn over such evidence; he must

also demonstrate prejudice. The prejudice standard for rule 16 violations is prescribed by rule 30(a) of the Utah Rules of Criminal Procedure, which provides that "[a]ny error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." Our Supreme Court has held that this ordinarily requires a defendant to show that, absent the State's violation, there is "a reasonable likelihood of a more favorable result for the defendant." *State v. Knight*, 734 P.2d 913, 919 (Utah 1987) (quotation simplified).

¶18 The State may withhold evidence, even following a defendant's request, if it is privileged by the United States or Utah constitutions, the Utah Rules of Evidence, "[o]ther rules adopted by the Utah Supreme Court," "[d]ecisions of the Utah courts," and "[e]xisting statutory provisions not in conflict with the above." Utah R. Evid. 501. No privileges to withhold evidence exist outside of these parameters. *See Nielsen v. State*, 2016 UT 52, ¶ 12, 391 P.3d 166 ("'[N]o person shall have a privilege to withhold evidence except as provided by these or other rules adopted by the Utah Supreme Court or by existing statutory provisions not in conflict with them.'") (quoting Utah R. Evid. 501 (1992)). *See also Clark v. Arizona*, 548 U.S. 735, 770 (2006) ("Well-established rules of evidence permit trial judges to exclude evidence.") (quotation simplified); Utah R. Evid. 501 advisory committee note ("There are no non-rule, non-statutory privileges.") (quotation simplified).

¶19 But a defendant's Sixth Amendment rights may be violated by even the proper assertion of one of these privileges if it causes the defendant to lose the ability to use the evidence to meaningfully confront and effectively cross-examine the State's witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Still, in cases where invoking a privilege or otherwise excluding evidence potentially violates a defendant's Sixth Amendment rights in this way, trial courts are nonetheless given "wide latitude insofar as the Confrontation Clause is concerned

to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant," *id.*, while at the same time not prohibiting "*all* inquiry" into the State's evidence or the credibility of the State's witnesses, *State v. Williams*, 773 P.2d 1368, 1372–73 (Utah 1989) (emphasis in original).

¶20    Thus, if the State withholds evidence pursuant to a valid privilege, which causes the defendant to lose the ability to effectively cross-examine a witness for the State, the defendant can assert a violation of his Sixth Amendment rights by reason of the exclusion. The trial court must then consider whether allowing the State to continue withholding the evidence will violate the defendant's Sixth Amendment right to confront the witnesses against him. *See id.* at 1372 (holding the trial court did not err by limiting cross-examination of victim *after* evidence of victim's consensual intercourse was deemed "not relevant" under rule 403 of the Utah Rules of Evidence); *State v. Marks*, 2011 UT App 262, ¶¶ 13, 23, 86, 262 P.3d 13 (holding the trial court properly restricted defendant from questioning victim about previous sexual conduct *after* the court determined it to be prohibited by rule 412 of the Utah Rules of Evidence); *Marks*, 2011 UT App 262, ¶ 11 ("When reviewing a trial court's decision to limit cross-examination, we [must first] review the legal rule applied for correctness and the application of the rule to the facts of the case for an abuse of discretion.") (quotation simplified). *See also State v. Hamblin*, 2010 UT App 239, ¶ 12, 239 P.3d 300 ("Whether an evidentiary ruling violated a defendant's right of confrontation is a question of law that we review for correctness."). Often the trial court can strike the right balance between the State's invocation of an evidentiary privilege and the defendant's assertion of the right to confront the witnesses against him by requiring the production of otherwise privileged evidence while at the same time "impos[ing] reasonable limits on . . . cross-examination." *Van Arsdall*, 475 U.S. at 679.

¶21 A trial court's ability to impose reasonable limits on cross-examination arises in this context only after the court has found a basis in a constitutional provision, statute, the rules of evidence, or case law to exclude the evidence; the defendant objects to that exclusion claiming it jeopardizes his ability to effectively confront and cross-examine the State's witness; and the trial court resolves the apparent impasse by allowing some inquiry into the evidence claimed to be privileged while imposing reasonable limits on defendant's cross-examination of the State's witness. But the imposition of "reasonable limits on cross-examination" is not a stand-alone principle that can justify the exclusion of evidence.

B

¶22 In the present case, the trial court expressly stated that it did not base its ruling allowing the State to withhold the surveillance location on an evidentiary privilege. Instead, it characterized its ruling as a "reasonable limit on cross examination." But by allowing the State to withhold the surveillance location from Ahmed, the court in essence improvised a privilege because, as discussed above, the exclusion of evidence is guided by the specific parameters set forth in rule 501 of the Utah Rules of Evidence, regardless of how the court characterized it.[5] Allowing the State to

_____

5. The State urges us to affirm on the ground that, on appeal, Ahmed did "not challenge[] each basis of the trial court's ruling" because Ahmed failed to address "the trial court's denial of his motion to arrest judgment—that denying disclosure imposed reasonable limits on cross-examination." However, as we have explained, because the trial court in essence invoked a surveillance location privilege in order to limit the cross-examination of the Officer concerning the details of his surveillance, Ahmed did address the basis of the trial court's

(continued…)

withhold evidence can only be based on a privilege or equivalent rule. *See* Utah R. Evid. 501. Reasonable limits on cross-examination become relevant only after the court determines that a privilege or other rule permits the withholding of evidence and the defendant then claims his ability to effectively cross-examine a State's witness is compromised, in violation of his Sixth Amendment right to confront the witnesses against him.

¶23 Citing *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), the State argues that the trial court's ruling was proper because courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *See id.* at 679. But such latitude is conferred upon the court only after a *valid* privilege or other rule permits the State to withhold evidence and the defendant has asserted a violation of his Sixth Amendment right to confront and effectively cross-examine witnesses against him. *See id.* Only then may the court "impose reasonable limits on . . . cross-examination," *id.*, thereby striking the balance between the State's interest in not disclosing privileged information and the defendant's interest in maximizing his Sixth Amendment rights.

---

(…continued)

ruling on appeal. In his opening brief, he argued that "the trial court erred by denying Ahmed's motion to access the police surveillance location because [it] is not privileged under Utah law" and "[t]his error allowed the State to refuse to disclose exculpatory evidence that would have allowed the defense to investigate the surveilling officer's ability to observe and identify Ahmed from the location."

¶24    This did not happen here. The trial court did not base its decision to protect the surveillance location on the United States or Utah constitutions, the Utah Rules of Evidence, a statute, or relevant case law. The trial court basically skipped that step in the analysis and went directly to imposing limits on cross-examination in a way that reinforced the evidentiary limitation it imposed rather than moderating the limitation so as to preserve Ahmed's confrontation rights.

¶25    Without a basis in rule 501 of the Utah Rules of Evidence, the court nonetheless determined, as a practical matter, that the Officer's surveillance location was privileged, which was erroneous because Utah law does not recognize such a privilege. Thus, the court erred in denying Ahmed the surveillance location on the theory it was a reasonable limit on cross-examination because there was no legal rule applied by the court in doing so, *see State v. Marks*, 2011 UT App 262, ¶ 11, 262 P.3d 13, and no basis on which to restrict the scope of cross-examination. With no privilege or other rule allowing the State to withhold it, the prosecution was required to disclose the surveillance location to Ahmed upon his request, in accordance with rule 16 of the Utah Rules of Criminal Procedure.

C

¶26    Having determined that there was no privilege or other rule allowing the State to withhold the surveillance location after Ahmed requested disclosure of the location pursuant to rule 16, *see* Utah R. Crim. P. 16(a)(4), we next consider whether this error prejudiced him.

¶27    Ordinarily, the defendant carries the burden of showing prejudice. But as the Utah Supreme Court stated in *State v. Knight*, 734 P.2d 913 (Utah 1987), this burden occasionally shifts to the State, requiring it to show "that despite the errors, the outcome of trial merits confidence and there is no reasonable

likelihood of a more favorable result for defendant." *Id.* at 921. *See also State v. Bell*, 770 P.2d 100, 106 (Utah 1988) ("[I]n some circumstances the nature of the error involved is such that this de facto burden should be shifted [to] the State."). This burden shifting "does not occur automatically" whenever the State violates rule 16. *State v. Draper-Roberts*, 2016 UT App 151, ¶ 38, 378 P.3d 1261. Rather, it shifts when it is "difficult for th[e] Court to determine from the record whether [the defendant] might have been able to prepare a better defense and achieve a more favorable result at trial" and the defendant has presented "a credible argument that the prosecutor's errors have impaired the defense." *Bell*, 770 P.2d at 106 (quotation simplified). *Accord Knight*, 734 P.2d at 921.

¶28 Here, it is difficult to discern from the record whether Ahmed might have had a more favorable result had he been granted access to the surveillance location. But he has presented a credible argument that his defense was impaired by the State's refusal to disclose the location. Thus, the burden shifts to the State to show that, despite the court's error, "the outcome of [Ahmed's] trial merits confidence and there is no reasonable likelihood of a more favorable result for [Ahmed]." *See Knight*, 734 P.2d at 921.

¶29 In this regard, we note that there are a few aspects of this case that are troubling. First, the Officer was confused as to who the taller of the two suspects was, telling the takedown officers that Pace was "taller" than Ahmed when in reality Pace was about half a foot shorter than Ahmed. Did some problem with the angle of view from the surveillance location skew the Officer's visual perspective? Second, the Officer did not provide any description of Ahmed's hat, distinctive braids, height, weight, hair color, or any other features typical in registering an identification. Did obstacles impede the Officer's ability to properly observe Ahmed from the surveillance location? Third, both Pace and Ahmed testified to wearing a "tan" jacket or coat.

Did the Officer possibly confuse the two because his view was obstructed or due to other issues causing some visual impediment from the surveillance location? These unanswered questions make it difficult for us to determine whether Ahmed might have been able to prepare a better defense and achieve a more favorable result at trial had he been able to investigate the surveillance location.

¶30 We do not necessarily fault the Officer for these oversights. It is obviously difficult for law enforcement officers stationed in the Rio Grande area, who make numerous drug-related arrests each month, to be able to accurately and quickly identify every suspect they take into custody. Given the rest of the inculpatory evidence—specifically, the substance found on the alleged buyer that appeared to match the spice found in the tan coat that both the Officer and the takedown officer testified Ahmed dropped, along with the Officer's testimony that he observed Ahmed and Pace interact for "about 30 minutes" in a manner consistent with a holder-dealer relationship, directly contradicting Ahmed's claim of being a mere passerby at the time of his arrest—our confidence in the jury's verdict would remain strong despite the Officer's limited description of the dealer, should an investigation of the surveillance location produce no exculpatory evidence.

¶31 But as we have little or no information on the surveillance location and potential obstructions—such as shadows, glares, dirty glass, cars, buses, trees, and sunlight—and given the possibility of error in the identification of the dealer, the validity of Ahmed's conviction hinges on the quality of the surveillance from the Officer's vantage point. Thus, it is "difficult for [us] to determine from the record whether [Ahmed] might have been able to prepare a better defense and achieve a more favorable result at trial." *See Bell*, 770 P.2d at 106. This, combined with the "credible argument" presented by Ahmed that because of the possible mistaken identification, the State's refusal to turn over

the surveillance location "impaired [his] defense," leads us to conclude that the burden concerning prejudice shifted to the State. *See id.* And the State has not carried this burden for the simple reason that it did not provide any evidence of the surveillance location or objective evidence concerning the quality of the view from that location. Therefore, "[b]ecause the State has failed to persuade us that the defense was not prejudiced by its nondisclosure of the [surveillance location], we conclude that absent the prosecutor's error[], there is a reasonable likelihood of a more favorable result for [Ahmed]." *See Knight*, 734 P.2d at 923.

D

¶32    Ahmed, however, is not automatically entitled to a new trial notwithstanding the apparent prejudice. This case is in a somewhat unusual posture. Ahmed has demonstrated only a single error by the trial court, while other evidence supports his conviction. But because the State has not persuaded us that "there is no reasonable likelihood that absent the error, the outcome of trial would have been more favorable" for Ahmed, *see State v. Knight*, 734 P.2d 913, 921 (Utah 1987), we are compelled to reverse the conviction despite the distinct possibility that an examination of the surveillance location may not provide any helpful evidence for Ahmed whatsoever. Thus, this error may ultimately prove not to have prejudiced Ahmed, rendering his conviction perfectly valid. Granting a new trial would then result in wasted resources and an unwarranted second bite at the apple for Ahmed.

¶33    "Given this imperfect state of affairs and the highly unusual posture of this case, we believe justice requires a remedy which is itself unusual." *State v. Ford*, 793 P.2d 397, 405 (Utah Ct. App. 1990). Accordingly, we provisionally reverse Ahmed's conviction and remand to the trial court with instructions that the surveillance location be disclosed to the

defense so it can make its own inquiries, observations, and measurements. If having done so, the defense recognizes there is nothing that would undermine the Officer's testimony, it will so advise the trial court, and Ahmed's conviction and sentence will simply be reinstated. But if the defense determines that there is substantial reason to believe it can more meaningfully cross-examine the Officer and throw Ahmed's guilt into doubt based on what it discovers at the surveillance location, the defense can present this evidence to the trial court. If the trial court views the evidence, resolving any doubt in favor of Ahmed, and "concludes that [Ahmed] would realistically have received no better [result at trial] with [the new evidence,] the [conviction and] sentence previously entered may simply be reimposed." *See id.* But if the court agrees that the defense will be able to more effectively cross-examine the Officer and cast reasonable doubt on Ahmed's guilt, it shall order a new trial.[6]

¶34    We believe this to be an appropriate remedy for all parties involved.[7] It provides Ahmed the ability to vindicate his rights if

---

6. Our holding does not prevent the trial court from directing the defense not to disclose to others in the community or, if the case proceeds to a new trial, to the jury, the specific address of the surveillance location, name of the property owner, name of the tenant if applicable, or name of the business if applicable. Ahmed has a right to view the surveillance location and his counsel will likely learn some of the details just mentioned in the process of doing so, but it does not follow that the information should be shared more widely. The trial court is free to restrict the further dissemination of this information to protect future police operations in the area as well as the privacy of the property owner, tenants, etc.

7. While unusual, this course of action is not unprecedented. In both *State v. Ford*, 793 P.2d 397, 405 (Utah Ct. App. 1990), and

(continued…)

withholding the surveillance location prejudiced him, while maximizing judicial efficiency in upholding the conviction if his investigation of the surveillance location fails to reveal the helpful evidence he hopes for.

## II. Insufficiency of the Evidence

¶35    Given the unique nature of our remand, we must address Ahmed's second issue on appeal, which could still be relevant if the defense finds no helpful evidence at the surveillance location and Ahmed is not granted a new trial.

¶36    Ahmed argues that, totally aside from the surveillance location issue, there was insufficient evidence to sustain his conviction because "the evidence was too speculative to support a conclusion that [the Officer] . . . correctly identified Ahmed as a person selling drugs, that the substance found on [the buyer] was spice, and that Ahmed possessed spice." Because the evidentiary sufficiency issue is germane only if the surveillance location provides no evidence in support of Ahmed's theory of misidentification, we assume for purposes of this analysis that the Officer had an unobstructed view from his location.

¶37    With this assumption in mind, there is sufficient evidence to support Ahmed's conviction. On the record before us, the jury

---

(…continued)
*State v. Stidham*, 2014 UT App 32, ¶ 31, 320 P.3d 696, we reversed and remanded convictions and sentences, instructing the trial courts to conduct evidentiary hearings and, if the trial court found no prejudice, to reinstate the convictions and sentences. Our approach is permitted under rule 30(b) of the Utah Rules of Appellate Procedure, which states, with our emphasis, that "[i]f a judgment of conviction is reversed, a new trial shall be held *unless otherwise specified by the court*."

could conclude that the Officer would have had a clear view, with the use of binoculars, of Ahmed and Pace dealing drugs for "about 30 minutes." During this time the Officer testified that he witnessed Ahmed and Pace deal spice in "multiple different ways" to approximately "10 to 15 separate individuals." This behavior was consistent with the Officer's experience in observing drug dealing.

¶38 The Officer also testified that Ahmed wore a "very large, heavy, tan coat" that he dropped as the takedown officers approached him. This was corroborated by one of the takedown officers who testified that he also saw Ahmed drop the coat. This coat had containers and joints of what was later confirmed, through testing, to be spice. In addition, while the joints found on the buyer were not tested, it is reasonable to infer that it was spice, as the joints in Ahmed's coat were confirmed to be spice and the buyer had joints on him immediately after interacting with Ahmed. While this may be circumstantial evidence, "it has long been established" that elements of crimes may be proven by circumstantial evidence as well as by direct evidence. *State v. Romero*, 554 P.2d 216, 217 (Utah 1976).

¶39 This evidence, assuming the Officer had an unobstructed view, clearly provides "some evidence" on "which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (quotation simplified). Thus, assuming unimpeachable surveillance, the trial court did not err in denying Ahmed's directed verdict motion as there was sufficient evidence to submit this case to the jury.

CONCLUSION

¶40 The trial court erred in denying Ahmed's request to access the Officer's surveillance location. This violated Ahmed's

right to discovery of the evidence against him as required by rule 16 of the Utah Rules of Criminal Procedure. And the State, having the burden concerning prejudice shifted to it, has failed to persuade us that absent this error there is no reasonable likelihood that Ahmed would have had a more favorable outcome at trial. Therefore, we provisionally reverse Ahmed's conviction and remand with instructions that Ahmed's defense be granted access to the surveillance location, and if the defense finds evidence that will allow it to more effectively cross-examine the Officer and cast reasonable doubt on Ahmed's guilt, that Ahmed be granted a new trial. If the surveillance location proves to be unassailable then the trial court shall simply reinstate Ahmed's conviction and sentence, as the evidence of record was sufficient to warrant submitting the case to the jury and to sustain Ahmed's conviction.

———————