2022 UT App 94

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAVID BRADLEY HUEY,
Appellant.

Opinion
No. 20200620-CA
Filed July 29, 2022

Fourth District Court, Provo Department
The Honorable Lynn W. Davis
No. 191400291

Emily Adams and Freyja Johnson,
Attorneys for Appellant

Sean D. Reyes, Nathan H. Jack, and John J. Nielsen,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGE RYAN M. HARRIS and JUSTICE DIANA HAGEN concurred.[1]

ORME, Judge:

¶1 David Bradley Huey appeals his convictions on one count of rape, two counts of forcible sodomy, two counts of object rape, and two counts of forcible sexual abuse. Huey argues that the trial court abused its discretion in denying a requested continuance and in not excluding the State's expert witness. He also argues that his trial counsel was ineffective in not objecting to three

---

1. Justice Diana Hagen began her work on this case as a judge of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on this case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

alleged instances of hearsay. We reject Huey's arguments and affirm.

BACKGROUND[2]

*The Abuse*

¶2 In 2019, Huey, a 51-year-old man, was dating a woman (Mother) who had a 16-year-old daughter (Sadie).[3] Huey first met Sadie when she ran away from home and Mother asked Huey to help find her. Sadie's father had recently passed away and Sadie was going through a difficult time, including running away from home and getting suspended from school for vaping.

¶3 Mother shared Sadie's challenges with Huey and told him that she wanted Sadie to be "safe" and "productive" during her suspension from school. Mother also informed Huey that Sadie "had some community service hours to do" as a result of her suspension. Huey told Mother "that he could sign off [on] her community service hours . . . because he did Habitat for Humanity" work and "offered to let her come to work with him." Mother agreed, and Huey told her that "he'd keep an eye" on Sadie.

¶4 Mother dropped Sadie off at Huey's home the next morning, a Thursday. Mother told Sadie that Huey was in charge and that "she was required to do what he said." After Mother left, rather than taking Sadie to a Habitat for Humanity worksite,

_____

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

3. Except for Huey, all the names used in this opinion are pseudonyms.

Huey took Sadie to a mansion where he was refinishing some cabinets. They worked until around 5:00 p.m. and returned to Huey's home. Huey then told Sadie that she "needed to spend the night because it was the respectful thing to do." Mother soon arrived to pick Sadie up, but when Mother told Sadie "it was time to leave," Huey told Sadie and Mother that Sadie "was spending the night." Mother then offered to spend the night as well, but Huey "cut her off and said that it was okay and that she should just leave," which she did.

¶5 After Mother left, Huey asked Sadie to smoke methamphetamine. Sadie, who had never used methamphetamine before, initially refused, but Huey "just kept asking and asking," so she eventually gave in. The drug made Sadie feel "crappy" and energized her so that she was unable to fall asleep. It also made her unable to "think[] straight" or "make a decision," so much so that she "couldn't even decide what [she] wanted to eat."

¶6 That night, while high on methamphetamine, Sadie and Huey lay in Huey's bed taking selfies and talking for around "six or seven hours, just about life." During this time, Sadie felt "like [Huey] understood [her]."

¶7 Sadie continued to work with Huey for about a week. She returned to her home Friday night and Saturday night after work but spent Sunday through Wednesday morning with Huey at the worksite and Huey's home. During this time, Huey had them use methamphetamine multiple times a day, at both locations. Huey had Sadie smoke the methamphetamine and ingest it in pill form. Sadie was essentially "under the influence the whole time" she was with Huey.

¶8 In addition to having Sadie use methamphetamine, Huey gradually cut off Sadie's communication with Mother. His behavior toward Sadie also became increasingly inappropriate. At the worksite, Huey began grabbing Sadie's breasts, buttocks, and

pubic area whenever he walked by her. Sadie told him not to, but "[h]e wouldn't say anything," and it "would . . . happen again." Sadie then "just gave up" trying to stop him "[b]ecause it didn't seem like there was a use to it." Huey also "talk[ed] about how he wanted to play with [Sadie's] virgin pussy."

¶9 When Sadie returned home Friday night and Saturday night, Huey messaged her asking her to send "naked pictures" and telling her "to run away with him." Sadie rebuffed both requests. But Huey "just kept bugging" her, "saying that he wanted to do stuff to" her because she was a virgin and "that it would be fun." Sadie "ignored him" but Huey persisted, telling her, "Let me do some things to you, . . . you sit back and I'll do all the work."

¶10 When Sadie was at Huey's home from Sunday through Wednesday morning, Huey said, "If you're going to sleep in someone's house you sleep in their bed because it's the respectful thing to do," and "it was a rule of his bed that you can't wear clothes." Sadie thought this "was gross" but complied, explaining, "I was scared to say no, that he was going to tell my mom about the meth." One night, while Sadie was lying in bed, Huey "started dry humping [her] in his sleep." When he woke up, Sadie told him what he had done and asked if she could sleep on the couch. Huey refused and told her to "just let it happen" and resumed humping her, this time "while he was awake."

¶11 On multiple occasions, Huey grabbed Sadie's breasts and "put his mouth on them," both over and under her clothes, leaving behind bruises. And "[m]ore than once," Huey penetrated Sadie's vagina with his finger. The first time occurred when Sadie was naked in Huey's bed pursuant to his "rule." Sadie told Huey to stop, but he "just kept doing it." Sadie "was scared and grossed out" and "just wanted to go home" but did not out of fear that he would tell Mother of her drug use. On another occasion, Huey had Sadie lie down on him on the couch with her back against his

chest. He then put his hands down Sadie's pants and touched the "outside [and] inside" of Sadie's vagina. Sadie again "asked him to stop," but "like before," Huey did not "say anything" and continued. On another occasion, while they were lying in bed, Huey "put his tongue and his mouth and his lips" on Sadie's vagina. Sadie also later told law enforcement that, during this time, Huey "got close to having sex with her" when he put "his penis . . . on her vagina" but stopped because Mother called him at that moment.

¶12   On Wednesday morning, the last day Sadie spent with Huey, the two again used methamphetamine and Huey again grabbed Sadie's breasts and digitally penetrated her vagina. Huey then wanted to have sex with Sadie but could not get an erection, so he made Sadie "put [her] hand on it and jerk it." When this failed, Huey did it himself until he was erect and then forced his penis into Sadie's vagina. While Huey did this, Sadie "didn't want to be there anymore" and "said something gross" in order "to gross him out so he'd kick me out." She "didn't . . . just leave" because she "wasn't thinking straight" due to the methamphetamine and "couldn't really think of a way to leave." Huey then called Sadie "a whore." Sadie responded, "I would have been better off fucking a stranger," at which point Huey told her to leave.

¶13   Sadie then dressed and went to a nearby gas station. She returned to Huey's home shortly thereafter, however, to retrieve her "dad's necklace and [her] earrings," which she had forgotten. After she retrieved those items, she returned to the gas station. During this time, Sadie called her friend, Jessica, and told her that she was leaving the home and that Huey had "forced her to do meth and raped her." When the phone call ended, Jessica told her father what Sadie had said, and he called the police.

¶14   While at the gas station, Sadie called another friend, Randy, and asked him for a ride. Huey then texted Sadie, telling

her, "We can forget about this" and "We can have a good day." Sadie did not respond, and Huey headed to the gas station. When she saw Huey's car pull into the gas station, Sadie asked a stranger for a ride. The stranger agreed to help and took Sadie to meet Randy.

¶15 Randy thought that Sadie was in "a lot of distress," "nervous," and "scared," and that she was under the influence of drugs because she was "fidgeting" and "just really high energetic." Sadie then asked Randy to drive her to a grocery store in her hometown. During the drive, Sadie told Randy that Huey forced her to take methamphetamine and have sex with him, following which Randy suggested they contact Mother and the police. Sadie resisted because she was afraid of getting in trouble for using methamphetamine.

¶16 When they got to Sadie's hometown, a police officer was already waiting for Sadie because of Jessica's father's earlier phone call to the police. The officer took Sadie to the hospital for a sexual assault examination and called Mother to inform her that Huey had raped Sadie. After learning this information, Mother called Huey and "asked him if he gave [Sadie] meth." Huey admitted that he did. Mother also "asked him if he raped my daughter." Huey responded, "I didn't rape your daughter." Mother then "asked him if he had sex with my daughter, and the only thing he answered" was, "I didn't rape your daughter."

¶17 During the sexual assault examination, Sadie disclosed to the nurse that Huey raped her using "verbal threats or coercion" but later clarified that "[h]e didn't threaten, but he tried to convince me to do things with him." The nurse then found three to four lacerations on Sadie's genitals, which she determined were "caused by an over-stretching or a stretching force or blunt force trauma to the area."

¶18 A toxicology report for Sadie came back positive for methamphetamine and amphetamine. Male DNA was retrieved

from Sadie's vagina but not in a sufficient amount to permit further testing. Finally, male DNA, which was matched to Huey, was retrieved from Sadie's breast.

*Legal Proceedings*

¶19 The State charged Huey with one count of rape, two counts of forcible sodomy, two counts of object rape, and two counts of forcible sexual abuse.[4] All four of these crimes required the State to show that Sadie did not consent to the contact. *See* Utah Code Ann. §§ 76-5-402, -402.2, -403, -404 (LexisNexis 2017 & Supp. 2021).[5] And under Utah's consent statute, any of these charged crimes are "without consent of the victim" if, as relevant here, (1) "the victim is younger than 18 years of age and at the time of the offense the actor . . . occupied a position of special trust in relation to the victim"; (2) "the actor knows or reasonably should know that the victim has a mental disease or defect, which renders the victim unable to . . . appraise the nature of the act[,] resist the act[,] understand the possible consequences to the victim's health or safety[,] or . . . appraise the nature of the relationship between the actor and the victim"; (3) "the victim expresses lack of consent through words or conduct"; or (4) "the victim is 14 years of age or older, but younger than 18 years of age, and the actor is more than three years older than the victim and entices or coerces the victim

---

4. The State also charged Huey with six counts of distribution of a controlled substance and several counts of sexual exploitation of a minor. The jury found Huey guilty of the distribution counts, and Huey does not appeal those convictions. The sexual exploitation counts were severed from the counts at issue here and are not part of this appeal.

5. Some of the statutes cited in this opinion have been revised since the events in this case transpired. Because these revisions have not materially altered the statutes as concerns this case, we cite the most recent printed version of the code for convenience.

to submit or participate." *Id.* § 76-5-406(2)(a), (f), (j), (k) (Supp. 2021). The jury would also later be instructed on the lesser-included offense of unlawful sexual conduct with a 16- or 17-year-old, which, unlike the more serious charges, does not require the State to prove lack of consent because the sexual act alone is enough for a conviction. *See id.* § 76-5-401(2).

¶20 As preparation for trial began, the State sent Huey a list of potential witnesses and exhibits. This list included the name of a forensic toxicologist (Expert) and toxicology reports for Sadie and Huey. The State then sent a notice of expert witness advising Huey of its intent to call Expert at trial. This notice included Expert's curriculum vitae and the toxicology reports, and it stated that Expert's "proposed testimony would include [his] qualifications and testimony regarding the Blood Toxicology of the defendant and the alleged victim."

¶21 During opening statements at trial, the prosecutor stated that Expert would opine on "what he calls a 'naive user'" of methamphetamine and that "their body doesn't know how to break down this methamphetamine very well" because "[i]t's an experience it's never had to deal with . . . before." The prosecutor further noted that Expert would explain how "methamphetamine will stay in a naive user's body longer, because it's taking the body longer to figure out how to get rid of it, versus an experienced user [whose] body has started to figure out how to get rid of methamphetamine a lot faster." Huey's attorney (Trial Counsel) did not object at this point.

¶22 Before the State called its first witness, Trial Counsel complained that the defense had received inadequate notice from the State regarding Expert's testimony about naive users. Trial Counsel argued that he thought Expert "was just going to present evidence of the drug tests" and would "not [be] interpreting them." The trial court deferred ruling on the issue until Expert was called to testify.

¶23    Later that day, Trial Counsel renewed his objection and sought a mistrial due to the claimed inadequacy of the notice of Expert's testimony. Trial Counsel asked the court to exclude Expert or, in the alternative, to grant a continuance so he could prepare to counter Expert's testimony. Specifically, Trial Counsel argued, "I haven't even consulted anybody," and "based on this testimony, which I didn't know was going to be coming out, . . . I probably would have hired an expert to talk about . . . a naive drug user." The prosecutor countered that "testifying about the general characteristics of methamphetamine and the effects of methamphetamine upon the body" was simply a part of toxicology, which Huey had already been put on notice would be included in Expert's testimony. The court agreed with the prosecutor and denied Trial Counsel's motions for a mistrial, exclusion of Expert, and a continuance.

¶24    At trial, Sadie, Mother, Jessica, Randy, and Expert were called as witnesses for the State. They all testified consistent with the facts previously laid out, but we provide further context regarding Mother's, Jessica's, Randy's, and Expert's testimonies to lay additional groundwork for the issues Huey raises on appeal.

¶25    While testifying, Mother was asked by the prosecutor about her call with Huey. Mother explained the call, and the prosecutor then inquired, "Did he ever say 'no,' when you asked if he had sex with your daughter?" Mother answered, "He never said, 'No.' He just responded and said, 'I didn't rape your daughter.'" Trial Counsel did not object to this exchange.

¶26    During Jessica's testimony, she explained that Sadie had called and told her "that she was at David Huey's house, and that she was trying to leave because of all of the things that were going on there." The prosecutor followed up, "Did she tell you at all what the things were that were going on there?" Jessica responded, "She said that he forced her to do meth and raped

her." The prosecutor then asked, "Did you get into more details about that?" Jessica responded, "No." The prosecutor also inquired about what was going on while she was on the phone with Sadie. Jessica answered that Sadie "was packing all of her stuff" and "got out of the house," and then Jessica "could hear the cars" and Sadie talk to "some random person" who was giving her a ride, at which point Sadie hung up. The prosecutor then asked whether she had any "concerns about [Sadie]" after the phone call ended. Jessica responded that she did, and the prosecutor asked, "So what did you do?" Jessica replied, "I told my dad and he called the cops."

¶27 During Randy's testimony, he recounted what he and Sadie had talked about during their drive. The prosecutor asked what he "believed to have occurred from [talking to] her." Randy responded, "How do I word it. Kind of like I would say forced to do things . . . not normal—like kids that age should be doing, and just in general, things that shouldn't be happening." The prosecutor asked if it involved sex, and Randy stated, "If I remember, yes, I . . . believe so."

¶28 Finally, during Expert's testimony, the following exchange took place:

> [Prosecutor]: When you were listing some of the different factors earlier that can affect the way methamphetamine is metabolized by a particular individual, I think you talked about someone's experience, their naivete as to use, in what way is that a factor?
>
> [Expert]: Different drugs react differently. For methamphetamine, what the factor for naivete versus not naivete means is the use—the body's use of it. I want to qualify what I'm about to say, though. Methamphetamine as a drug of abuse has not been studied clinically in humans at high levels.

As such we can only use the low level dosing which is used for medicinal uses in rat trials; but because of that, one of the things that they've noticed in rats is that you get a different—basically the methamphetamine goes to different portions of the body, depending upon whether you're naive or not.

If you're a naive user, more of it goes to the brain, less of it goes to the blood.

. . . .

So eventually what it does is it changes the way that the body reacts to that, and that changes the distribution of the drug. In some—in some drugs that can actually result in its being eliminated faster. Methamphetamine actually just changes where it's going to go. Sometimes it goes to the—in a naive user it's not used to it and so it goes directly to the brain; but in an experienced user less of it goes to the brain and more of it stays in the blood plasma.

¶29   During closing argument, the prosecutor emphasized that "the heart of the matter" is "consent." The prosecutor explained that Sadie could not have consented to any sexual activity for four independent reasons: (1) because Huey occupied a position of special trust vis-à-vis Sadie, (2) because Sadie had a "mental defect" caused by the methamphetamine, (3) because Sadie said no, and (4) because Huey was more than three years older than Sadie and coerced her. During Trial Counsel's closing, he conceded that there was at least one incident of sexual activity between Huey and Sadie but encouraged the jury to convict him of the lesser-included crime of unlawful sexual conduct with a 16- or 17-year-old because Sadie consented to the sexual activity that did occur.

¶30 The jury rejected Trial Counsel's argument and convicted Huey as charged. Huey appeals.

## ISSUES AND STANDARDS OF REVIEW

¶31 Huey raises three issues for our consideration. First, he challenges the trial court's denial of his motion for a continuance. "A district court's decision to grant or deny a continuance is discretionary, and we will not reverse such a decision absent a clear abuse of that discretion." *State v. Peraza*, 2020 UT App 173, ¶ 4, 479 P.3d 1139 (quotation simplified).

¶32 Second, Huey argues that the trial court should have disallowed Expert's testimony about naive users because that testimony lacked a sufficiently reliable foundation.[6] "We review the admission of expert testimony . . . under an abuse of discretion standard." *State v. Lopez*, 2018 UT 5, ¶ 18, 417 P.3d 116.

¶33 Third, Huey contends that Trial Counsel provided ineffective assistance by not objecting to what he characterizes as inadmissible hearsay testimony offered by Mother, Jessica, and Randy. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

---

6. The State contends that this issue is unpreserved. Because we resolve the merits of the claim in the State's favor, we need not address this preservation argument. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("If the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation.") (quotation simplified).

ANALYSIS

I. Continuance and Reliability of Expert's Testimony

¶34    Because Huey's first two issues relate to Expert, we address them together. Huey first contends that the trial court abused its discretion by not granting his motion to continue the trial because he was not properly notified of Expert's testimony. Second, he argues that the court should have excluded Expert's testimony due to lack of reliability. But to prevail on either of these issues, Huey must demonstrate that the court's rulings prejudiced him, and he has not done so. *See State v. Peraza*, 2020 UT 48, ¶ 58, 469 P.3d 1023 ("In general, when a party unsuccessfully requests a continuance to procure a witness, based not on a particular statute or rule but pursuant to the court's inherent authority to manage the case, the movant must prove prejudice on appeal."); Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). *See also State v. Ahmed*, 2019 UT App 65, ¶ 17, 441 P.3d 777 ("Our Supreme Court has held that [the prejudice standard] ordinarily requires a defendant to show that, absent the [error], there is 'a reasonable likelihood of a more favorable result for the defendant.'") (quoting *State v. Knight*, 734 P.2d 913, 919 (Utah 1987)).

¶35    Even assuming, without deciding, that the court abused its discretion in denying a continuance for Huey to find a rebuttal expert or in admitting Expert's testimony, there is not a reasonable likelihood that Huey would have been acquitted given the evidence the State presented to support its three remaining theories of non-consent, which were completely unrelated to Expert's testimony.[7]

---

7. Another reason Huey cannot show prejudice regarding the denial of his continuance request is that Huey has not, even on

(continued…)

¶36 Here, in addition to the theory that Sadie could not have consented because she had a "mental defect" caused by the methamphetamine—which was the only theory Expert's

---

appeal, claimed that a competing expert even exists who could meaningfully counter Expert's testimony about the effect of methamphetamine on naive users. Thus, even if the court had granted Huey's continuance request, he has not shown that he could have used that continuance to his advantage and undermined Expert's testimony to the point that it likely would have changed the jury's verdict.

Additionally, Huey cannot show prejudice on either claim because Expert's testimony was not the only testimony supporting the State's mental defect theory. Sadie provided ample testimony about the effect the methamphetamine had on her. She testified that the drugs made her feel "crappy" and gave her so much energy that she was unable to fall asleep, made her unable to "think[] straight," and made her unable to "make a decision," even as simple a decision as what to eat. She also testified that on the morning Huey raped her, she "didn't . . . just leave" because she "wasn't thinking straight, because of the meth" and "couldn't really think of a way to leave." Sadie further testified that she was essentially "under the influence" of these drugs, which altered her mental state, "the whole time" she was with Huey. Huey did not challenge this testimony below, nor does he on appeal, and thus he cannot show that Expert's testimony prejudiced him. This is so because Sadie's own testimony provided evidence that Huey "kn[ew] or reasonably should [have] know[n]" that Sadie had a "mental . . . defect" that rendered her "unable to . . . appraise the nature of the [sexual acts perpetrated by Huey,] resist the act[s,] understand the possible consequences to [her] health or safety[,] or . . . appraise the nature of the relationship between [Huey] and [herself]." *See* Utah Code Ann. § 76-5-406(2)(f) (LexisNexis Supp. 2021). Accordingly, there is not a reasonable probability that Huey would have received a better result at trial without Expert's testimony under the State's mental defect theory.

testimony went to—the State also presented evidence that Sadie could not consent because Huey occupied a position of special trust, because Sadie said no to Huey's invitations to engage in sexual activity, and because Huey was more than three years older than Sadie and had coerced her. Accordingly, because the jury had three other theories that were well supported by evidence on which to find that Sadie did not legally consent to the acts Huey perpetrated, Huey cannot show that there is a reasonable likelihood that he would have obtained a more favorable result at trial had Expert been excluded or had his continuance request been granted. *See Knight*, 734 P.2d at 919.

¶37    The State's main theory at trial was that Sadie could not have consented because she was under 18 years old and Huey occupied a position of special trust with her. This was the first theory the prosecutor addressed in closing. Specifically, he stated, "The main question you're probably going to be asked to answer in this case is really how was he able to do this? The answer to that question is trust. He created a position of special trust for himself with respect to [Sadie]." Under Utah's consent statute, "[a]n act of sexual intercourse, rape, . . . object rape, . . . forcible sodomy, . . . [or] forcible sexual abuse, . . . is without consent of the victim" if "the victim is younger than 18 years of age and at the time of the offense the actor . . . occupied a position of special trust in relation to the victim." Utah Code Ann. § 76-5-406(2)(j) (LexisNexis Supp. 2021). A "[p]osition of special trust" is defined, among other things, as "any individual in a position of authority . . . which enables the individual to exercise undue influence over the child." *Id.* § 76-5-404.1(1)(c)(xxii).

¶38    Huey argues that he does not qualify as an individual in a position of special trust with Sadie under the statute. We disagree. There was plenty of evidence presented that because Huey was "in a position of authority" over Sadie, she could not have consented to the acts Huey perpetrated. Mother testified that she gave Huey authority over Sadie and that he had control over her

at the worksite and at his home. Mother further testified that she shared Sadie's challenges with Huey and entrusted Sadie to his care because she wanted Sadie to be "safe" and "productive" during her suspension from school. Mother also testified that Huey told her that he could "sign off [on Sadie's] community service hours . . . because he did Habitat for Humanity" work and "offered to let her come to work with him." Mother agreed, and Huey told her that "he'd keep an eye on her." When she dropped her off at Huey's house, Mother told Sadie that Huey was in charge and that she had to do what he said. Thus, Huey was directly responsible for Sadie and Sadie was admonished to follow his commands, qualifying Huey as an "individual in a position of authority . . . which enable[d] [Huey] to exercise undue influence over [Sadie]." *See id. See also State v. Rowley*, 2008 UT App 233, ¶ 15, 189 P.3d 109 (holding that evidence supported the jury's finding that the defendant, who was the father of the victim's best friend, occupied a position of special trust because the defendant was an "authority figure" and "exercised some amount of supervision" over the victim during the nights she spent at the defendant's home).

¶39 For these reasons, it is not reasonably likely that, had Expert been excluded or had Huey been granted a continuance to prepare to meet Expert's testimony, Huey would have received a better result at trial.[8]

¶40 Huey resists this conclusion and argues that he was prejudiced because the "case hinged on the jury's assessment of [Sadie's] credibility," which was impeached at trial. He asserts that Expert's "testimony rehabilitated [Sadie], and the evidence

---

8. By focusing on Huey being unable to establish prejudice due to the State's well-supported theory that Huey occupied a position of special trust, we do not mean to imply that there was a paucity of evidence presented by the State on its other lack-of-consent theories.

against [him] on the [other] theories of consent was not overwhelming." We disagree. As already discussed, there was plenty of evidence before the jury that Huey occupied a position of special trust in relation to Sadie, and on this basis Sadie could not have consented. And we do not view Expert's testimony as rehabilitating Sadie's testimony to any meaningful extent.

¶41 Huey points to two instances at trial where Sadie's credibility was called into serious question. First, he points to a statement Sadie made to a police officer that it was possible that "it seem[ed] like I was into it" because "every girl react[s] to it, but he thought I was into it." And second, he contends that Sadie's statement to him that she "would have been better off fucking a stranger" could have led the jury to think that Sadie "had a choice about whether to engage in sexual activity with [him] instead of a stranger." Huey then asserts that Expert's testimony on naive users of methamphetamine rehabilitated Sadie's testimony and likens this case to *State v. Peraza*, 2020 UT App 173, 479 P.3d 1139. But that case is readily distinguishable.

¶42 In *Peraza*, the trial court denied a continuance after the defendant complained of inadequate notice from the State regarding its expert witness. *Id.* ¶¶ 2, 7. The State called the expert witness specifically to rehabilitate the victim's credibility, due to her recantation, by testifying that it was "'not unheard of' in child sexual abuse victims" for children to recant or to gradually disclose the abuse. *Id.* ¶ 7. This court determined that the defendant was prejudiced by denial of the continuance because the expert's testimony "had the clear effect of rehabilitating [the victim's] credibility, and without the opportunity to present a defense rebuttal expert, [the defendant] was handicapped in presenting his defense." *Id.* ¶ 8. Thus, the expert's testimony about recantation went *directly* to the victim's credibility because that is what the victim had done: recant. That is not what happened here.

¶43 Expert testified regarding naive users of methamphetamine and the heightened effects of the drug on naive users. This testimony has no logical connection to Sadie's statements that Huey may have thought she was "into it" or that she "would have been better off fucking a stranger." There was no "clear effect of rehabilitating" Sadie's credibility like what happened with the victim in *Peraza*. Rather, it is significantly disconnected from Sadie's credibility and would not have enhanced Sadie's credibility on these points. Thus, this case is distinguishable from *Peraza*, and we do not see any prejudicial effect of Expert's testimony in this regard.

## II. Ineffective Assistance of Counsel

¶44 An ineffective assistance of counsel claim requires a defendant to prove both that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 (quotation simplified).

¶45 To establish deficient performance, i.e., that trial counsel's actions "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689. Indeed, "even if an [act or] omission is inadvertent and not due to a purposeful strategy, relief is not automatic." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 (quotation simplified). Instead, "even if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶46 To establish prejudice, "a defendant must present sufficient evidence to support a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different." *Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 (quotation simplified). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶47    Huey contends that Trial Counsel was ineffective for not objecting to three instances of allegedly inadmissible hearsay from the testimonies of Mother, Jessica, and Randy. We address each in turn and determine that Trial Counsel did not perform deficiently in declining to object to any of the challenged statements.

¶48    As relevant here, hearsay is a "statement" that "the declarant does not make while testifying at the current trial or hearing," and is offered by a party "to prove the truth of the matter asserted in the statement." Utah R. Evid. 801(c). "Sometimes, statements that appear on the surface to be hearsay are not. Accordingly, if an out of court statement is offered for some other purpose—e.g., to show its effect of the hearer's state of mind and not for its truth—it is not hearsay." *Arnold v. Grigsby*, 2018 UT 14, ¶ 20, 417 P.3d 606 (quotation simplified). Additionally, an exception to the hearsay rule allows the admission of statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Utah R. Evid. 803(2). These are referred to as "excited utterances." Here we do not need to definitively determine if the complained-of statements were in fact inadmissible hearsay. All we must do is determine whether it was "objectively unreasonable" for Trial Counsel not to have objected to their introduction. *See Scott*, 2020 UT 13, ¶ 36.

A.    Mother's Testimony

¶49    Huey first asserts that Mother's testimony—both that an officer called to tell her that "they were taking [Sadie] to the hospital" and "that she had been raped by Dave Huey"—was

hearsay and that Trial Counsel performed deficiently by not objecting to it. We disagree. This statement by the officer, offered by Mother, does not appear to have been used "to prove the truth of the matter asserted," i.e., that Huey raped Sadie. Rather, this testimony was critical in providing context for Mother's narrative as to why she called Huey and got the concession from him that she did. Specifically, Mother called Huey and asked if he had raped Sadie; Huey said he did not. But when she asked if he had sex with Sadie, Huey just repeated that he did not rape her. Thus, the complained-of statement from the officer, repeated by Mother, was not used to prove that Huey raped Sadie but to explain why Mother would have called and asked Huey if he raped her daughter. *See Arnold*, 2018 UT 14, ¶ 20. Without the explanation of what the officer told Mother in the phone call, the narrative about Mother's subsequent phone call to Huey would have made little sense. People simply do not call one another randomly to inquire whether they have recently raped someone.

¶50 Under these circumstances, reasonable counsel could have concluded that the officer's statement to Mother was not offered to prove the truth of the matter asserted—that Huey raped Sadie—but rather was offered to lay the groundwork for Mother's call to Huey. Given this context, we cannot say that it was "objectively unreasonable" for Trial Counsel not to object to the statement. *See Scott*, 2020 UT 13, ¶ 36.

B.      Jessica's and Randy's Testimonies

¶51 Huey argues that Jessica's testimony—that Sadie told her on the phone that Huey "forced her to do meth and raped her"—was inadmissible hearsay and that Trial Counsel performed deficiently in not objecting to it. Huey also complains that Trial Counsel performed deficiently in not objecting when Randy responded, "If I remember, yes, I . . . believe so," to the prosecutor's question whether Sadie told him why she needed a ride and if that reason involved sex with Huey. We disagree on

both counts. Trial Counsel could have reasonably surmised that Sadie's statements to both Jessica and Randy were not inadmissible hearsay because they qualified as excited utterances.[9] *See* Utah R. Evid. 803(2).

¶52    Huey contends that Sadie's statements to Jessica did not qualify as excited utterances because Sadie's "conversation with [Jessica] occurred well after the sexual activity occurred: [Sadie] already left the house, walked to the gas station, and returned to the house when she called [Jessica]." Huey also argues that Sadie's statements to Randy could not be excited utterances because the "statements came after [Sadie] left [Huey's] house for the second time and was making the more-than-30-minute drive" to her hometown. Thus, Huey asserts that "[b]ecause of the temporal distance between the sexual activity and [Sadie's] conversation with [Jessica]," and "[b]ecause [Sadie] was separated by time and physical distance from . . . Huey and the sexual activity" when she made her statements to Randy, neither could qualify as excited utterances.

¶53    These are valid points, and they do undercut a definitive conclusion that Sadie's statements qualified as excited utterances.

---

9. Trial Counsel could also have reasonably determined that Sadie's statement to Jessica was not hearsay because it was used "to show its effect [on Jessica's] state of mind and not for its truth." *See Arnold v. Grigsby*, 2018 UT 14, ¶ 20, 417 P.3d 606 (quotation simplified). Specifically, after Jessica testified about her phone call with Sadie, in which Sadie told her that she had been raped, the prosecutor then asked Jessica if she had any "concerns about [Sadie]." Jessica responded that she did, and the prosecutor asked, "So what did you do?" Jessica replied, "I told my dad and he called the cops." Reasonable counsel could have determined that Sadie's statement was intended only to explain why Jessica did what she did next and not to prove the truth of the matter asserted. *See id.*

But again, our role in this appeal is not to categorically determine if Sadie's statements to Jessica and Randy were inadmissible hearsay. Rather, we must determine whether reasonable counsel, when "considering all the circumstances," could have determined that they qualified as excited utterances and decided to forgo an objection on that basis. *See Scott*, 2020 UT 13, ¶ 36. We conclude that reasonable counsel could have so determined.

¶54 The test for whether a statement qualifies as an excited utterance is threefold:

> First, an "event or condition" must occur that is sufficiently startling to cause an excitement that stills normal reflective thought processes. Second, the declarant's declaration must be a spontaneous reaction to the event or condition, not the result of reflective thought. Third, the utterance must relate to the startling event.

*State v. Smith*, 909 P.2d 236, 239 (Utah 1995). Additionally, "the justification for the exception disappears as the emotional excitement of the declarant subsides and the declarant's capacity for reflection revives." *Id.* at 240. Thus, while "the utterance need not be contemporaneous with the event, temporal proximity is a factor to be considered." *Id.* Here, only the second part of the threefold test is in question because the first and third parts are relatively straightforward and were likely met here. Indeed, Huey's challenge on appeal focuses only on the spontaneity of Sadie's statements to Jessica and Randy.

¶55 We disagree with Huey that the "temporal distance" between the sexual abuse and Sadie's call to Jessica is necessarily dispositive in this case, i.e., that it rendered Trial Counsel's determination not to object unreasonable. Trial Counsel could have reasonably determined that Sadie's statement qualified as an excited utterance notwithstanding the temporal gap between event and statement. Reasonable counsel could have determined

that given the distressing situation stemming over several days, Sadie's statement to Jessica, when Sadie was finally free, was spontaneous and made while she was still in an excited state because of those traumatic events. Although Sadie did call Jessica after she had already left Huey's house and then returned to the house to retrieve her jewelry, and some time had passed since the rape, Sadie called from the very home where she was just raped and talked to Jessica while she was in that home and again fleeing the home and the perpetrator. Being at the location where sexual abuse had been perpetrated and where the perpetrator was still present, and talking to a friend while hurriedly fleeing that location, would be understandably distressing. Whether or not true in an absolute sense, reasonable counsel could conclude that this provided ample evidence of the spontaneity of Sadie's statements. And it is not unreasonable to conclude that a 16-year-old rape victim under the influence of methamphetamine would still be under significant stress from the rape for a longer period of time than some other rape victims might be.

¶56    Further evidence of this spontaneity that reasonable counsel could have relied on in deciding not to object is the fact that Jessica testified that Sadie called her and told her "that she was at David Huey's house, and that she was trying to leave because of all of the things that were going on there" and "that he forced her to do meth and raped her." The prosecutor then asked, "Did you get into more details about that?" Jessica responded, "No." Thus, there was no testimony that there was a long drawn-out conversation that would have allowed for Sadie's "emotional excitement [to] subside[]" and for her "capacity for reflection [to] revive[]." *See id.* at 241. Rather, Sadie called Jessica and *immediately* told her that she was leaving the house because she was forced to do drugs and was raped.

¶57    Much the same is true regarding Sadie's statements to Randy. The time gap from when Sadie was raped until she entered Randy's car is not dispositive in determining whether

Trial Counsel acted unreasonably in not objecting to Randy's testimony. Trial Counsel could have reasonably concluded that Sadie's statements to Randy were still made while she was "under the stress of excitement that" caused the statement and that the statement qualified as an exited utterance. *See* Utah R. Evid. 803(2). Specifically, Sadie was a 16-year-old minor who had just been raped by a 51-year-old man, and she was attempting to get away from him and to a safe location. And Huey had recently followed Sadie to the gas station after she fled Huey's house, forcing Sadie to ask for a ride from a complete stranger to take her to meet Randy and to the relative safety this would afford her. Additionally, Randy testified that when Sadie arrived she seemed to be in "a lot of distress," was "nervous," and was "scared." This testimony provided evidence that Sadie was still under the excitement or stress from the abuse, and when combined with the facts of Sadie's flight from Huey to reach Randy's protection, could have led Trial Counsel to reasonably conclude that Sadie's statements to Randy qualified as excited utterances.[10]

---

10. We acknowledge that there is limited evidence regarding Sadie's emotional state during her phone call with Jessica and her car ride with Randy and that usually the party seeking to admit statements under the excited utterance exception—the State in this instance—must present "sufficient evidence" to the trial court so that it can "logically conclude the stress and excitement of the startling event were in full force and effect for the declarant, without lapses, when the statement was made." *See West Valley City v. Hutto*, 2000 UT App 188, ¶ 20, 5 P.3d 1. But because Huey did not object to these statements at trial, the State was never put to its proof in seeking the admission of the complained-of statements under this exception, leaving us with limited evidence regarding Sadie's emotional state at the time these statements were made. But we emphasize again that we are looking at this only through the lens of ineffective assistance of counsel, and we

(continued…)

¶58 Huey relies heavily on *State v. Williams*, 2020 UT App 67, 462 P.3d 832, to establish that Sadie's statements were not excited utterances. In that case, this court held that statements made soon after an assault at the end of a nine-minute 911 call, as opposed to those made at the beginning of the call, were not excited utterances because the adult individual's statements became less spontaneous, his breathing slowed, and his voice calmed. *Id.* ¶ 31. Huey's reliance on this case is unavailing for three reasons.

¶59 First, and most importantly, this court issued *Williams* in April 2020, nearly two months after Huey's trial was held in February 2020. And because Huey's claim is that Trial Counsel was ineffective in not objecting to the statements as hearsay, this case cannot be relied on to show that Trial Counsel performed deficiently because Trial Counsel did not have the benefit of *Williams. See State v. Newton*, 2020 UT 24, ¶ 28 n.9, 466 P.3d 135 ("In assessing whether counsel's performance was deficient, we must look at the facts and the law available to counsel at the time of the representation.") (quotation simplified).

¶60 Second, in *Williams*, the hearsay objection was preserved, and evidence was introduced so that this court had the benefit of

---

are not considering whether the statements actually qualified as excited utterances, as we would do if the court had overruled a hearsay objection. The current context leaves Huey arguing that Trial Counsel was ineffective for not objecting, which places the burden on Huey to rebut the strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *See Strickland v. Washington*, 466 U.S. 668, 690 (1984). And notwithstanding the limited evidence bearing on Sadie's emotional state, we conclude that Trial Counsel could have reasonably determined that Sadie's statements were excited utterances. Huey has thus not rebutted that strong presumption on this record.

testimony regarding the individual's breathing, his tone of voice, and the spontaneity of his statements. With all that evidence in the record and dealing with a preserved claim, this court was able to make a definitive determination of whether the individual's statements given soon after an assault qualified as hearsay. Here, as previously noted, Huey did not preserve this claim, so we do not have the benefit of testimony specifically detailing Sadie's emotional state and cannot make a definitive determination if the statements she made to Jessica and Randy were excited utterances. We are only determining if Trial Counsel could have reasonably determined that they were excited utterances, based on the evidence in the record before us. And, as previously stated, given the circumstances of Sadie's statements to both Jessica and Randy, we determine that reasonable counsel could have so concluded.

¶61 Finally, reasonable counsel could have determined that Sadie's statements qualified as excited utterances even in the face of *Williams*. This is so because in that case it was clear at the beginning of the call that the individual was under the stress of the assault—a rapid violent affair—and his "tone of voice, labored breathing, and spontaneous exclamations" all "reflect[ed] his apparent emotional state and intensity of emotional reaction." *Williams*, 2020 UT App 67, ¶¶ 28–29 (quotation simplified). But when another dispatcher joined the call, the individual's "voice calmed, his breathing slowed, and his answers . . . became less spontaneous." *Id.* ¶ 31. This court determined that after this point, any of the statements made by the individual were not excited utterances. *Id.* Here, reasonable counsel could have determined that the stress of the event on Sadie was not like that in *Williams* and was ongoing because Sadie was a minor high on methamphetamine who made the statements while fleeing from Huey, who had just raped her. Indeed, Huey even followed Sadie to the gas station, requiring her to abandon her plans to meet Randy there and obtain a ride from a complete stranger to avoid

Huey. Reasonable counsel could have determined that in the face of these facts, this case was distinguishable from *Williams*.

¶62    Thus, the temporal gap between the abuse and Sadie's statements to Jessica and Randy is not dispositive because reasonable counsel could have concluded that, even though some time had passed between the abuse and Sadie's statements, she was still "under the stress of excitement" when she made the statements and the statements qualified as excited utterances. *See* Utah R. Evid. 803(2). *Cf. State v. Smith*, 909 P.2d 236, 241 (Utah 1995) (stating that "[g]iven the overpowering emotional trauma and the significant physical injuries caused by the assault, the victim's statements . . . notwithstanding the two- to three-hour time lapse, clearly evidenced a spontaneity prompted by a continuing aroused mental state" and thus qualified as an excited utterance); *United States v. Smith*, 606 F.3d 1270, 1280 (10th Cir. 2010) (holding that a statement by a rape victim made roughly two hours after the assault made "only upon escaping from" the defendant and "still under obvious stress from the attack" qualified as an excited utterance); *United States v. Rosetta*, No. 97-2023, 1997 WL 651027, at *2 (10th Cir. Oct. 20, 1997) (holding that a statement made by a rape victim nine hours after the assault was an excited utterance because the victim was "acutely traumatized" and in a "panic state").

¶63    "Considering all the circumstances," we cannot say that Trial Counsel was "objectively unreasonable" in forgoing an objection because he could reasonably have determined that Sadie's statements to Jessica and Randy qualified as excited utterances.[11] *See State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. *See*

---

11. It is worth noting that even if reasonable counsel would have concluded that the complained-of testimony was objectionable, reasonable counsel could still have decided that this was not a battle worth fighting given that Sadie also testified in detail about

(continued…)

*also State v. Ray*, 2020 UT 12, ¶ 36, 469 P.3d 871 (noting that we "must always base [our] deficiency determination on the ultimate question of whether counsel's act or omission fell below an objective standard of reasonableness").

CONCLUSION

¶64 Huey suffered no prejudice from the trial court's denial of his continuance motion directed at Expert's testimony or his motion to exclude Expert's testimony. There is not a reasonable probability that he would have received a better result at trial given the State's compelling evidence that Sadie did not lawfully consent given Huey's position of special trust—a theory completely unrelated to Expert's testimony. And Trial Counsel did not perform deficiently in forgoing hearsay objections to statements in Mother's, Jessica's, or Randy's testimonies because reasonable counsel could have determined that the statements did not constitute hearsay or were excited utterances.

¶65 Affirmed.

––––––––––

the rape, and Trial Counsel could have reasonably elected to forgo an objection to the mostly cumulative testimony on that basis.